IN THE UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF ARKANSAS
LITTLE ROCK DIVISION

IN RE: BOBBY TANKERSLEY AND                          CASE NO. 4:15-bk-16102
    MARY E. TANKERSLEY                                                    (Chapter 7)

Debtors.

## MEMORANDUM OPINION

Before the Court is the *Objection to Exemptions Claimed by Debtors* [Doc. No. 89]

("**Objection**") filed on July 7, 2016, by M. Randy Rice, the duly appointed Chapter 7 Trustee

("**Trustee**").  The Trustee raises three objections to the exemptions claimed by the Debtors,

Bobby "Bob" Tankersley and Mary Tankersley (collectively, the "**Debtors**").

   First, the Trustee alleges the property exempted is not jointly owned; therefore, the

debtor without an ownership interest in the property is not allowed to exempt the property.

Second, the Trustee argues that the real property claimed as exempt under 11 U.S.C. § 522(d)(1)

does not qualify for the federal exemption because neither the Debtors nor any dependent of the

Debtors used the property as a residence on the petition date.  Finally, the Trustee contends that

the Debtors have undervalued certain real property located in Faulkner County, Arkansas, in an

attempt to fully exempt property that, if properly valued, would not be entitled to a full

exemption under the Bankruptcy Code.

    The Debtors argue that they have inchoate dower and curtesy rights to each other's

property and are allowed an exemption based on these rights.  The Debtors further contend that

the property claimed as exempt under 11 U.S.C. § 522(d)(1) was being rented by the Debtors to a

tenant who resided there on the petition date and the Debtors may exempt the property as a

second home or even as residential rental property. As to the valuation issue, the Debtors dispute that the real property is undervalued.

The Court conducted a hearing on the Trustee's Objection. The Debtors appeared in person and by and through their attorney, Kevin P. Keech. The Trustee appeared in person and on his own behalf. At the close of the hearing, the Court requested the parties to submit post-trial briefs and thereafter took the matter under advisement. For the following reasons, the Trustee's Objection is sustained.

## JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(B). The following constitutes the Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052, made applicable to this contested matter by Federal Rule of Bankruptcy Procedure 9014.

## FACTS

The Debtors filed a voluntary joint petition for relief under the provisions of Chapter 7 of the United States Bankruptcy Code on December 3, 2015. The parties stipulated that the claims register reflects total claims of $2,056,701.53. At the time of the hearing the only funds received in the case were $62,364.09 from the sale of fifty-two acres of real property belonging to the Debtors.

At the time of filing bankruptcy, Bob Tankersley was in poor health, recovering from cancer of the eye, three heart attacks, and gall bladder surgery. During the fourteen years prior to filing bankruptcy, Bob Tankersley owned Co-Bar Contracting, Inc. (**"Co-Bar"**), a construction business that cleared land and installed water and sewer lines in subdivisions. He became

involved in Co-Bar at the request of his son, Charles Tankersley, who needed help reestablishing himself in business after his bankruptcy.  In testimony, Bob Tankersley was described as illiterate, and, although he was the titular head of Co-Bar, his role at the company was to run errands, while Charles Tankersley and Charles' then-wife, Sharon Tankersley, handled the day-to-day operations and made the business decisions.

Bob and Mary Tankersley married in 1986.  At the time they married, Mary Tankersley owned a house in Sherwood, Arkansas, (the **"Sherwood Property"**).  After marriage, the Debtors lived in the Sherwood Property together as husband and wife, from 1986 until 2008 when they purchased property at 302 Walkers Corner Road (the **"Walkers Corner Property"**) in Scott, Arkansas, from Co-Bar.  Their property consisted of a house and an acre of land that was part of a larger tract of land owned by Co-Bar.

The Debtors were living in the Walkers Corner Property at the time the bankruptcy petition was filed, and it is reflected as the Debtors' address on the bankruptcy petition. (Debtors' Ex. 1, at 2).

The purchase agreement for the Walkers Corner Property between Bob and Mary Tankersley and Co-Bar dated August 31, 2008, reflected a purchase price of $120,000.00. (Debtors' Ex. 18).  The Debtors paid Co-Bar $95,000.00 from the sale proceeds of the Sherwood Property as a down payment for the Walkers Corner Property.  Mary Tankersey testified that they were buying the Walkers Corner Property to live in "for the rest of their lives."  (Tr. at 59).

The parties agreed that the $25,000.00 balance remaining on the purchase price could be satisfied by making needed improvements to the Walkers Corner Property.  Mary Tankersley testified that they spent at least $100,000.00 on improvements.  Unfortunately, the Debtors never received the deed to the property because Co-Bar had pledged it to the sellers at the time it

purchased the property, and, upon Co-Bar's default, the sellers foreclosed on the property.  In Mary Tankersley's words, they did not receive the deed because her "stepson didn't pay his part of the property and . . . we couldn't afford to make his payments and ours."  (Tr. at 58).

Mary Tankersley testified that at the time of the hearing she and her husband lived in Vilonia, Arkansas, where they moved in June 2016, approximately six months after the bankruptcy was filed.  The Debtors are renting the property with an option to purchase.  Currently they pay $600.00 per month and within three years could choose to purchase the property for $100,000.00.  However, Mary Tankersley further testified that the option will not be available to them because they will not be able to obtain a loan for that amount.

In their schedules, the Debtors listed, among other property, five tracts of real property in Faulkner County, Arkansas.  These five tracts, each claimed as exempt by the Debtors and the subjects of the Trustee's objection, will be collectively referred to as the "**Faulkner County Properties**."  Two other assets scheduled by the Debtors are relevant to the Trustee's objection to exemptions.  The first is 177 shares of common stock in Johnson & Johnson, (the "**J&J Stock**"), and the second is an interest in a life insurance policy with New York Life Insurance Company ("**Life Insurance Policy**").  (Trustee's Ex. 1; Debtors' Exs. 1, 10).  Each of these assets will be discussed separately below.

### *Faulkner County Properties*

The schedules reflect that only Mary Tankersley holds an interest in the five tracts of land that comprise the Faulkner County Properties.  (Debtors' Ex. 1, Sch. A/B at 11-13).  At trial, Mary Tankersley testified that she inherited the Faulkner County Properties from her mother around 1981, prior to her marriage to Bob Tankersley in 1986.  (Tr. at 22, 28).  Consistent with Mary Tankersley's testimony, the Trustee introduced a Warranty Deed dated November 11,

1981, from Elizabeth Cartwright signed by her attorney-in fact, Jerry W. Cartwright, to Mary Cartwright (Mary Tankersley's maiden name) and a Warranty Deed dated December 31, 1984, from Jerry W. Cartwright, as Executor of the Last Will and Testament of Elizabeth Cartwright, to Mary Cartwright. (Trustee's Ex. 2). The Trustee does not dispute that Mary Tankersley inherited the Faulkner County Properties from her mother. Although Mary Tankersley testified that it was her intention to put Bob Tankersley's name on the deeds to the properties, she could not recall any specific steps she took to do so.

The Trustee also introduced two personal financial statements of the Debtors dated December 31, 2011, and December 31, 2012. (Trustee's Ex. 5). Each financial statement listed the Faulkner County Properties and indicated that the combined value was $190,000.00. Mary Tankersley testified that the financial statements were necessary for Co-Bar to obtain bonds for projects. She further testified that she had seen the financial statements, but explained that Charles Tankersley's former spouse, Sharon Tankersley, prepared them and had arrived at the reflected value. Mary Tankersley stated that the Faulkner County Properties were not worth $190,000.00 in 2011 or 2012, but also admitted to reviewing the financial statements after they were prepared, signing them, and knowing that they were being used to obtain bonds for Co-Bar for projects.[1]

The financial statements contain a note with the following language, "This information contained on this statement was obtained from Mr. and Mrs. Bobby Tankersley. Estimated values are not based on independent appraisal." (Trustee's Ex. 5). Mary Tankersley testified that the statement is inaccurate.

---

[1] The financial statement also listed a personal residence valued at $150,000.00, which was the Debtors' residence at the time, the Walkers Corner Property. The statement listed no indebtedness related to the property but Mary Tankersley admitted that statement "wasn't true." (Tr. at 71).

Mary Tankersley's testimony regarding the values of the Faulkner County Properties consistently reflected uncertainty. At one point she conceded, "I don't know what the land is running out there." (Tr. at 62). She testified that the valuations given to the properties in the schedules were either based on the tax assessor's records or on her guess of what the properties would be worth. Testimony and documentary evidence regarding the separate tracts of land are summarized below.

### 17 Acre Tract

The Debtors' Schedule A/B lists the 17 Acre Tract with a value of $25,400.00. (Trustee's Ex. 1; Debtors' Ex. 1). The description of the property states, "Value is Tax Appraisal." (Trustee's Ex. 1; Debtors' Ex. 1). The 17 Acre Tract is exempted for the same amount on the Debtors' Schedule C, pursuant to Section 522(d)(1). (Trustee's Ex. 1; Debtors' Ex. 1). Mary Tankersley testified that in her opinion this was the value of the property at the time she filed bankruptcy. She admitted that she was determining the value of the property based on the appraisal by the assessor's office.

At the hearing, the Trustee introduced into evidence the Residential Property Cards maintained by the Faulkner County Assessor's Office for the Faulkner County Properties ("**Property Tax Cards**"). (Trustee's Ex. 4). The assessor's records indicate that the 2016 appraised value for the 17 Acre Tract was $24,950.00. (Trustee's Ex. 4).

As to the 17 Acre Tract, Mary Tankersley testified that she was unsure of the value of the property, stating "I would just have to guess, but I don't know." (Tr. at 60). She acknowledged that the valuation of the 17 Acre Tract given on the schedules of $25,400.00 was close to the tax assessor's valuation of the property of $24,950.00, and later agreed that the value was approximately $25,000.00.

6

Of the five Faulkner County Properties, the 17 Acre Tract is the only property listed with improvements, which consist of a two-bedroom house and an old dairy barn. Mary Tankersley testified that the house on the 17 Acre Tract is her childhood home, but she has not lived there since she married in the early 1960s. Prior to the time Bob Tankersley established Co-Bar for his son, the couple discussed moving from the Sherwood Property and living on the 17 Acre Tract but moved to the Walkers Corner Property instead.

Mary Tankersley testified that an individual who was residing in the house had moved out after the Debtors filed bankruptcy, that no one resides there now, that the home is not in suitable condition to be lived in by anyone, and that she herself would not consider living there. She estimated that it would cost $50,000.00 to $75,000.00 to repair the property to make it habitable.

She further testified that the former tenant was a "homeless guy" who had begged her for a place to stay. (Tr. at 31). She explained that the house was in poor condition when he moved in because former tenants had "gutted it" and that she allowed him to pay rent of $200.00 a month as he was able to pay. She stated that "[m]aybe every other month, he'd pay me." (Tr. at 31).

Mary Tankersley also testified that after she and Bob Tankersley learned they did not have title to the Walkers Corner Property, they discussed putting a travel trailer on the 17 Acre Tract. This discussion took place around the time the bankruptcy was filed, but at the time they were not physically or financially able to make improvements, such as installing a septic tank and water lines, that would be required to serve a travel trailer used as a residence.

7

### Two Acre Tract

The Debtors' Schedule A/B lists the Two Acre Tract with a value of $1,000.00. (Trustee's Ex. 1; Debtors' Ex. 1). The description of the property reflects, "Value is Tax Appraised Value." (Trustee's Ex. 1; Debtors' Ex. 1). The same amount is reflected as the exemption the Debtors claim on their Schedule C pursuant to Section 522(d)(5). (Trustee's Ex. 1; Debtors' Ex. 1).

Mary Tankersley testified that in her opinion the value of the property is $1,500.00 to $2,000.00, but that her $1,000.00 valuation stated in the schedules is close to the value of the property. She stated that she based her determination of value on the appraisal by the tax assessor's office. However, the assessor's Property Tax Cards indicate that the 2016 appraised value of the Two Acre Tract was $350.00. (Trustee's Ex. 4). According to Mary Tankersley, a pumping station is located at the entrance to the tract, which she believes reduces the value of the property.

### 2.94 Acre Tract

The Debtors' Schedule A/B lists the 2.94 Acre Tract with a value of $5,000.00. (Trustee's Ex. 1; Debtors' Ex. 1). The description of the property states, "Tax Appraisal value is 17,400. Value below is debtors [sic] assessment." (Trustee's Ex. 1; Debtors' Ex. 1). The $5,000.00 amount is also the amount reflected as the exemption the Debtors claim on their Schedule C pursuant to Section 522(d)(5). (Trustee's Ex. 1; Debtors' Ex. 1). The assessor's records as reflected on the Property Tax Cards indicate that the 2016 appraised value of the 2.94 Acre Tract was $17,650.00. (Trustee's Ex. 4).

As to the 2.94 Acre Tract, Mary Tankersley testified that she believed the property was worth between $4,000.00 and $5,000.00, which she recognized was below the tax assessor's

8

valuation of $17,650.00.  She testified that she believed this to be the value of the property at the time of her bankruptcy filing "[she] guess[ed] because of the way it looked to [her] at the time" because it was "all grown up [and] . . . full of woods."  (Tr. at 68).

### Three Acre Tract

The Debtors' Schedule A/B lists the Three Acre Tract with a value of $1,900.00. (Trustee's Ex. 1; Debtors' Ex. 1).  The description of the property states, "Value is Tax Appraisal."  (Trustee's Ex. 1; Debtors' Ex. 1).  The same amount is reflected as the exemption the Debtors claim on their Schedule C pursuant to Section 522(d)(5).  (Trustee's Ex. 1; Debtors' Ex. 1).  Mary Tankersley testified that she intended to put the tax-appraised value in the schedules and admitted that she was determining the value of the property by looking at the appraisal by the assessor's office.  However, the assessor's Property Tax Cards indicate that the 2016 appraised value of the Three Acre Tract was $19,000.00, not $1,900.00.  (Trustee's Ex. 4).

When questioned about the Three Acre Tract, she stated the scheduled value of $1,900.00 was just an estimate, that she did not really know what the value of the property was, but that she intended to put the tax-appraised value, as indicated in her schedules.

### 13 Acre Tract

The Debtors' Schedule A/B lists the 13 Acre Tract with a value of $1,850.00.  (Trustee's Ex. 1; Debtors' Ex. 1).  The description of the property states, "Value is Tax Appraisal Value." (Trustee's Ex. 1; Debtors' Ex. 1).  The same amount is reflected as the exemption the Debtors claim on their Schedule C pursuant to Section 522(d)(5).  (Trustee's Ex. 1; Debtors' Ex. 1).

Although the property was listed with a value of $1,850.00 on the Debtors' Schedule A/B, Mary Tankersley testified that "at most" the 13 Acre Tract may be worth $2,500.00.  She admitted that she was determining the value of the property by looking at the

value of the property as appraised by the assessor's office.  Mary Tankersley testified that her last visit to the property occurred shortly after she married Bob Tankersley in 1986.  She stated that the property is situated on a hill and, at the time of her last visit, was very wooded.

The tax assessor's Property Tax Cards indicate that the 2016 appraised value of the 13 Acre Tract was $1,600.00.  (Trustee's Ex. 4).

### *Johnson & Johnson Stock*

The Debtors' Schedule A/B lists 177 shares of J&J Stock as an asset with a value of $18,124.80.  (Trustee's Ex. 1; Debtors' Ex. 1).  The Debtors claimed a $12,649.99 exemption in the J&J Stock on their Schedule C pursuant to Section 522(d)(5).  (Trustee's Ex. 1; Debtors' Ex. 1).

Mary Tankersley testified that she worked for Johnson & Johnson for nearly thirty-two years, from February 1966 to December 1997.   She acquired the J&J Stock as part of her employment benefits as bonuses or raises for about twenty years before she married Bob Tankersley and did not acquire any J&J stock after they were married.  Further, she testified that she thought she had "added Bob's name recently . . . because if I died, . . . he could have something."  (Tr. at 40).  The Trustee introduced into evidence a document showing a dividend payment on the J&J Stock in September 2015, which was addressed to Mary Tankersley only.  (Trustee's Ex. 3).  No documentary evidence was introduced to indicate joint ownership.

### *Life Insurance Policy*

The Debtors' Schedule A/B lists an interest in the Life Insurance Policy with a surrender value of $28,413.09.  (Trustee's Ex. 1; Debtors' Exs. 1, 10).  The amount of $24,500.00 is reflected as the amount of exemption the Debtors claim on their Schedule C pursuant to Section 522(d)(8).  (Trustee's Ex. 1; Debtors' Ex. 1).

The Debtors testified that Co-Bar purchased the Life Insurance Policy with a face value of $100,000.00 in order to obtain certain bonds it needed to perform contracting services. Bob Tankersley was named as the insured under the policy and Co-Bar paid the premiums. (Trustee's Ex. 7). Bob Tankersley testified that at the time he filed bankruptcy, the beneficiary under the Life Insurance Policy was Kaye Lynn Wilcox, Charles Tankersley's current wife. He further stated that he authorized his bankruptcy counsel to liquidate the policy for the cash surrender value, and, as a result, received a check for $17,407.66, which remained with his bankruptcy counsel at the time of the hearing. (Debtors' Ex. 16). Mary Tankersley testified that she was neither an insured person nor beneficiary under the policy.

## DISCUSSION

When the Debtors, as husband and wife, filed a single voluntary petition under Chapter 7, a "joint case" was commenced that created one case for administrative purposes. 11 U.S.C. § 302(a) (2012); *In re James*, 496 B.R. 590, 591 (Bankr. W.D. Ark. 2013) (citing *In re Beck*, 298 B.R. 616, 624 (Bankr. W.D. Mo. 2003)).

The filing of a petition for relief creates an estate comprising all of a debtor's legal and equitable interests in property as of the commencement of the case, with certain exceptions not relevant here. 11 U.S.C. § 541(a) (2012). A joint case consists of two separate estates unless the estates are consolidated by the bankruptcy court. 11 U.S.C. § 302(b) (2012). Each debtor may exempt certain property interests from the estate. 11 U.S.C. § 522(b)(1) (2012). Section 522(m) provides that in joint cases the exemptions "shall apply separately with respect to each debtor." 11 U.S.C. § 522(m) (2012).

The Debtors elected to claim exemptions pursuant to Section 522(d), making the following provisions of that Bankruptcy Code subsection applicable to the Trustee's Objection:

11

(1)     The debtor's aggregate interest, not to exceed $22,975 in value, in real property or personal property that the debtor or a dependent of the debtor uses as a residence . . . .

(5)     The debtor's aggregate interest in any property, not to exceed in value $1,225 plus up to $11,500 of any unused amount of the exemption provided under paragraph (1) of this subsection.

(8)     The debtor's aggregate interest, not to exceed in value $12,250 less any amount of property of the estate transferred in the manner specified in section 542(d) of this title, in any accrued dividend or interest under, or loan value of, any unmatured life insurance contract owned by the debtor under which the insured is the debtor or an individual of whom the debtor is a dependent.

11 U.S.C. § 522(d)(1), (5), & (8) (2012).[2]

In the unconsolidated joint case before the Court the two estates remain separate and distinct. *Bunker v. Peyton (In re Bunker),* 312 F.3d 145, 153 (4th Cir. 2002) (citing *In re Reider,* 31 F.3d 1102, 1109 (11th Cir. 1994)).   Exemptions are available to both Bob Tankersley and Mary Tankersley to the extent each has an interest in property of his or her own bankruptcy estate.  Exemption statutes are to be construed liberally in favor of the debtor.  *Wallerstedt v. Sosne (In re Wallerstedt),* 930 F.2d 630, 631 (8th Cir. 1991) (citing *Norwest Bank Nebraska, N.A. v. Tveten,* 848 F.2d 871, 875 (8th Cir. 1988); *Murry v. Zuke,* 408 F.2d 483, 487 (8th Cir. 1969)).  "Property interests are created and defined by state law."  *Butner v. United States*, 440 U.S. 48, 55 (1979).

The Trustee has the burden of proving that the Debtors did not properly claim their exemptions.  FED. R. BANKR. P. 4003(c).  Each of the three issues raised by the Trustee's Objection will be addressed separately below.

---

[2] The dollar amounts in Section 522(d) are periodically adjusted by the Judicial Conference of the United States pursuant to the formula provided in 11 U.S.C. § 104. The amounts referred to in Section 522(d) herein were in effect when the Tankersleys filed their bankruptcy petition in 2015.

*Ownership of Property Claimed as Exempt*

The Trustee contends that Bob Tankersley improperly claims an exemption in the Faulkner County Properties and J&J Stock because he has no interest in the assets to exempt. Similarly, he argues that Mary Tankersley improperly claims an exemption in the cash surrender value of the Life Insurance Policy because she has no interest in the asset to exempt. [3]

The Debtors argue they have inchoate curtesy and dower rights in the assets and are entitled to joint exemptions based on these inchoate rights.

The Debtors do not dispute and, in fact, concede that Bob Tankersley is "not named on the deed" to the Faulkner County Properties and Mary Tankersley "does not hold legal title" to the Life Insurance Policy. (Debtors' Br. at 1, Nov. 14, 2016, Doc. #101). This concession is consistent with the testimony and evidence introduced at the hearing.

Although the same concession is not made by the Debtors in their post-trial brief as to the J&J Stock, the testimony and evidence make clear that Mary Tankersley is the sole owner of the J&J Stock. Mary Tankersley acquired the J&J Stock as part of her employment benefits while working at Johnson & Johnson and did so prior to her marriage to Bob Tankersley. The Trustee introduced evidence of a dividend payment on the J&J Stock with only Mary Tankersley's name reflected on the confirmation of payment. (Trustee's Ex. 3).

Therefore, the Court finds the Trustee has met his burden of proving that the Faulkner County Properties and the J&J Stock are owned solely by Mary Tankersley and the Life Insurance Policy is owned solely by Bob Tankersley.

---

[3] In making his argument the Trustee relies on the case of *In re James,* 496 B.R. 590 (Bankr. W.D. Ark. 2013). In the *James* case the debtor-wife contended that she had an equitable interest in property owned by the debtor-husband and should be able to exempt the interest in his property that she would receive in an equitable distribution if they divorced. *In re James,* 496 B.R. at 592. The *James* case is inapposite to the instant case, where the Debtors assert dower and curtesy rights in each other's property, not their rights under a hypothetical equitable distribution.

The next question to resolve is how to treat each debtor's inchoate curtesy or dower interest in the other's solely owned property. The statutes and case law related to real property interests differ from those concerning personal property interests, and each type of property will be discussed separately.

***Faulkner County Properties***

Arkansas law provides the following dower and curtesy rights in real estate to surviving spouses where the deceased dies leaving a surviving spouse and no children:

> (a)(1) If a person dies leaving a surviving spouse and no children, the surviving spouse shall be endowed in fee simple of one-half ( ½ ) of the real estate of which the deceased person died seized when the estate is a new acquisition and not an ancestral estate . . . absolutely, and in his or her own right, as against collateral heirs.
>
> (2) However, as against creditors, the surviving spouse shall be invested with one-third ( ⅓ ) of the real estate in fee simple if a new acquisition, and not ancestral . . . absolutely.
>
> (b) If the real estate of the deceased person is an ancestral estate, the surviving spouse shall be endowed in a life estate of one-half ( ½ ) of the estate as against collateral heirs and one-third ( ⅓ ) as against creditors.

ARK. CODE ANN. § 28-11-307 (2012).

Based on this statute, if a spouse dies without children, her surviving spouse is invested in a fee simple interest of one-half of the real property owned by her prior to her death as against collateral heirs, unless the property is ancestral. ARK. CODE ANN. § 28-11-307(a)(1); *see also In re Flippin*, 334 B.R. 434, 436 (Bankr. W.D. Ark. 2005), *aff'd in part, supplemented in part sub nom. Clark v. Flippin,* No. 05-3066, 2006 WL 2850046 (W.D. Ark. Sept. 29, 2006). If the property is ancestral and the spouse dies without children, the surviving spouse is entitled to only a life estate in one-half of the real property as against collateral heirs. ARK. CODE ANN. § 28-11-307(b). The statutes also provide that, as against creditors, the surviving spouse shall be invested

14

with one-third of the real estate in fee simple if a new acquisition and shall be endowed in a life estate of one-third of the real estate if an ancestral estate. ARK. CODE ANN. § 28-11-307(a)(2) & (b).

Importantly, prior to the death of the spouse, the dower or curtesy interest is "a recognizable interest in real estate in the form of an inchoate right of dower [or curtesy] by virtue of the parties' marriage." *In re Flippin,* 334 B.R. at 436 (citing *Le Croy v. Cook*, 211 Ark. 966, 969, 204 S.W.2d 173, 174 (1947); *In re Lambert,* 57 B.R. 710, 712-13 (Bankr. N.D. Ohio 1986)). This inchoate right is "a valuable right which the law . . . recognize[s] and protect[s]." *Skelly Oil Co. v. Murphy*, 180 Ark. 1023, 24 S.W.2d 314, 315 (1930) (citing *Tatum v. Tatum*, 174 Ark. 110, 295 S.W. 720 (1927)).

Under Arkansas law, "no act, deed, or conveyance executed or performed by one spouse without the assent of the other spouse, evinced by acknowledgment in the manner required by law, shall pass the estate of dower or curtesy." *Webber v. Webber,* 331 Ark. 395, 399, 962 S.W.2d 345, 347 (1998) (citing ARK. CODE ANN. § 28-11-201(a) (1987)). The Arkansas Supreme Court has repeatedly acknowledged the favored position the law has accorded to the right of dower. *See, e.g.*, *Tatum v. Tatum*, 174 Ark. 110, 295 S.W. 720, 721 (1927)("[I]t is said that 'dower is favored in law in a high degree, and is held sacred only next to life and liberty.'" (quoting *Crittenden v. Woodruff*, 11 Ark. 82 (1850))).

Indeed, Arkansas law has long recognized that the "inchoate rights of the wife are as much entitled to protection as the vested right of the widow." *Id.* (citations omitted). This inchoate right of dower or curtesy in real estate is an interest in property that becomes property of the estate at the time a bankruptcy petition is filed. *In re Flippin,* 334 B.R. at 436 ("Because

15

§ 541 includes *all* legal and equitable interests as property of the debtor's estate, the Court finds that the debtor's inchoate dower interest in her husband's property is property of the debtor's estate."). The interest is a property interest that a debtor may claim as exempt. *In re Whitt,* 534 B.R. 320, 322 (Bankr. N.D. Ohio 2015) (citing *In re Wycuff*, 332 B.R. 297 (Bankr. N.D. Ohio 2005); *In re Miller*, 151 B.R. 800 (Bankr. N.D. Ohio 1992); *Gilbert v. Castor (In re Castor)*, 99 B.R. 807, 811-12 (Bankr. S.D. Ohio 1989); *In re Hill*, 11 B.R. 217 (Bankr. S.D. Ohio 1981)).

Applying the law to the facts in this case as to the real estate claimed as exempt, the Court finds that Bob Tankersley has an inchoate curtesy interest in the Faulkner County Properties. Bob Tankersley and Mary Tankersley are husband and wife. The Faulkner County Properties are ancestral lands, having been inherited by Mary Tankersley from her mother in 1981 prior to her marriage to Bob Tankersley. *George v. Alexander,* 229 Ark. 593, 594, 317 S.W.2d 124, 125-26 (1958) (defining ancestral estates as those that "come to the intestate by gift, or devise, from either parent, or from any relation of the blood of either parent" for purposes of the curtesy, descent and distribution statute) (quoting *Carter v. Carter*, 129 Ark. 7, 195 S.W. 10, 11 (1917)); *Coolidge v. Burke*, 69 Ark. 237, 62 S.W. 583, 584 (1901) (concluding that ancestral estates are not acquired by "industry or exertion . . . [or] by the deed or will of a stranger to [the] blood").

Because Mary Tankersley's real estate interest in the Faulkner County Properties is ancestral, Bob Tankersley's inchoate curtesy interest is in the nature of a future life estate rather than a fee simple estate. ARK. CODE ANN. § 28-11-307(b). The record does not contain evidence that Mary Tankersley has children. Therefore, if Bob Tankersley survives Mary Tankersley, he will be endowed in a life estate in one-half of the real property as against

16

collateral heirs and endowed in a life estate of one-third of the real estate as against creditors. ARK. CODE ANN. § 28-11-307.

Based on the applicable statutes and state law as discussed above, Bob Tankersley held an inchoate life estate interest in Mary Tankersley's Faulkner County Properties at the time of the bankruptcy filing, and that interest is property of his bankruptcy estate.

### J&J Stock and Life Insurance Policy

The Court has already found that Mary Tankersley is the sole owner of the J&J Stock and Bob Tankersley is the sole owner of the Life Insurance Policy. Arkansas law provides for dower and curtesy rights in personal property under the following circumstances:

> (a)(1) If a person dies leaving a surviving spouse and no children, the surviving spouse shall be endowed in fee simple . . . of one-half ( ½ ) of the personal estate, absolutely, and in his or her own right, as against collateral heirs.

> (2) However, as against creditors, the surviving spouse shall be invested with . . . one-third ( ⅓ ) of the personal property absolutely.

ARK. CODE ANN. § 28-11-307(a) (2012).

Further, "[i]f a person dies leaving a surviving spouse and a child or children, the surviving spouse shall be entitled, as part of dower or curtesy in his or her own right, to one-third ( ⅓ ) part of the personal estate whereof the deceased spouse died seized or possessed." ARK. CODE ANN. § 28-11-305 (2012).

In deciding an Arkansas case in 1905, the Eighth Circuit Court of Appeals interpreted the dower statute then in effect regarding personal property. The statute provided that "'[a] widow shall be entitled as part of her dower, in her own right, to one-third of the personal estate *** whereof the husband died seised or possessed.'" *In re McKenzie,* 142 F. 383, 387 (8th Cir. 1905) (quoting Kirby's Digest § 2708). The Eighth Circuit explained that personal property is of a "different character" than real estate:

> [T]he husband's dominion over [personal property] is more complete.  He is not
> prohibited by the laws of Arkansas from selling, pledging, mortgaging, or giving
> it to third parties free from the rights of dower and from all other rights and claims
> of his wife.  While she has an inchoate right of dower in the real estate of her
> husband while living, she has no right whatever in his personal property until his
> death.  Her interest in the latter does not accrue until he dies, and then it attaches
> to the personal property of which he was seised or possessed at his death, only.

*Id.* at 386.

Unlike a spouse's inchoate dower or curtesy interest in real estate that is protected during

the marriage, there are no such protections for similar interests in personal property prior to the

spouse's death.  "A wife has no inchoate right of dower in the personal property of her husband

and he may dispose of such personal property at his pleasure."  *Featherston v. Hartford Fire Ins.*

*Co.,* 146 F. Supp. 535, 539 (W.D. Ark. 1956) (citing *McClure v. Owens*, 32 Ark. 443, 444

(1877)).  The right of dower or curtesy in personal property "does not accrue until [the spouse's]

death, and only in such as [the spouse] then owns."  *McClure,* 32 Ark. at 444.

Applying the statutes and case law to the facts in this case as to the J&J Stock, the Court

concludes that Bob Tankersley had no property interest in the J&J Stock on the petition date.  He

had no curtesy interest in the J&J Stock on the petition date because Mary Tankersley, as the sole

legal owner, was still living.  *Id.*  Since his curtesy right had not yet accrued, it did not become

property of his estate upon the filing of the bankruptcy petition.  Therefore, Bob Tankersley has

no property interest in the J&J Stock to claim as exempt in this bankruptcy proceeding.  *In re*

*Horstman,* 276 B.R. 80, 82 (Bankr. E.D.N.C. 2002) (holding exemptions may not be claimed in

property that is not part of the debtor's bankruptcy estate).

Similarly, the Court finds that Mary Tankersley had no property interest in the Life

Insurance Policy on the petition date.  Bob Tankersley was named as the insured under the

policy.  (Trustee's Ex. 7).  Mary Tankersley was not an insured person under the policy nor was

she named as a beneficiary on the petition date.  Arkansas law does not provide Mary Tankersley with a dower right in the Life Insurance Policy or the cash value proceeds that belong to her husband, who is still living.  Since her dower right had not yet accrued, it did not become property of her bankruptcy estate upon the petition filing.  *Id.*  Therefore, Mary Tankersley has no property interest in the Life Insurance Policy to claim as exempt in this bankruptcy proceeding.

Based on the foregoing analysis, the Court finds that the Trustee's Objection to the Debtors' exemptions as joint owners in the Faulkner County Properties, J&J Stock, and Life Insurance Policy is sustained.  Bob Tankersley's property interest in the Faulkner County Properties is limited to his inchoate curtesy interest as stated herein.  Bob Tankersley has no property interest in Mary Tankersley's J&J Stock to claim as exempt.  Mary Tankersley has no property interest in Bob Tankersley's Life Insurance Policy to claim as exempt.

### ***Residential Exemption of the 17 Acre Tract***

The next issue raised by the Trustee's Objection is whether the Debtors may claim the 17 Acre Tract as exempt under 11 U.S.C. § 522(d)(1).  The Trustee objects on the basis that the property does not qualify for the federal exemption because neither the Debtors nor any of their dependents used the property as a residence on the petition date.  The Trustee argues further that the Debtors have never lived on the 17 Acre Tract and the property was uninhabitable on the petition date and at the time of the hearing.

The Debtors disagree and argue that the property was being used as a residence by the Debtors on the petition date, thus entitling the Debtors to claim an exemption of the property as either a second home or as residential rental property.

Property claimed as exempt is deemed exempt unless a party in interest objects.

11 U.S.C. § 522(l) (2012); *In re Feliciano,* 487 B.R. 47, 50 (Bankr. D. Mass. 2013).  The

objecting party has the burden of proving that the exemptions are not properly claimed.  FED. R.

BANKR. P. 4003(c).  "'If the objecting party can produce evidence to rebut the exemption, the

burden of production then shifts to the debtor to come forward with unequivocal evidence to

demonstrate that the exemption is proper . . . the burden of persuasion, however, always remains

with the objecting party.'"  *In re Roberts,* 280 B.R. 540, 544-45 (Bankr. D. Mass. 2001) (quoting

*Carter v. Anderson (In re Carter)*, 182 F.3d 1027, 1029 (9th Cir.1999)).

Exemption rights are to be construed liberally in favor of the debtor to meet the goal of

Congress of "providing a meaningful fresh start for debtors."  *In re Feliciano,* 487 B.R. at 50

(quoting *In re Griffith*, 449 B.R. 909, 911 (Bankr. W.D. Wis. 2011)).

Section 522(d)(1) allows a debtor to exempt her "aggregate interest, not to exceed

$22,975 in value, in real property or personal property that the debtor or a dependent of the

debtor uses as a residence . . . ."  11 U.S.C. § 522(d)(1) (2012).  The language of this statute must

be interpreted according to its plain meaning unless such an interpretation would lead to an

absurd result.  *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.,* 530 U.S. 1, 6

(2000) (quoting *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989)).

The term "residence" is not defined by the Bankruptcy Code but the term is not

ambiguous.  *In re Feliciano,* 487 B.R. at 51 (citing *In re Lawrence*, 469 B.R. 140, 142 (Bankr. D.

Mass. 2012)); *In re Demeter*, 478 B.R. 281, 287 (Bankr. E.D. Mich. 2012); *In re Gandy,* 327

B.R. 807, 809 (Bankr. S.D. Tex. 2005).  "Residence" is defined by Black's Law Dictionary as,

"The place where one actually lives, as distinguished from a domicile . . . . *Residence* usually just

means bodily presence as an inhabitant in a given place; *domicile* usually requires bodily

presence plus an intention to make the place one's home.  A person thus may have more than one residence at a time but only one domicile."  *Residence*, BLACK'S LAW DICTIONARY (10th ed. 2014).  The ordinary meaning of "residence" is consistent with its legal definition:  "The place where one actually lives or has his home as distinguished from his technical domicile."  *Residence*, WEBSTER'S NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE (3d ed. 1986).

Courts have noted that the term "residence" alone, without a modifier such as "principal" or "primary," reflects Congress's intention not to limit the residence to the debtor's principal or primary residence.  *In re Lawrence,* 469 B.R. at 142.  "By choosing not to limit the residence qualified for exemption under § 522(d) to a principal or primary residence, Congress presumably intended to encompass a broader category than principal residences, namely any residence."  *In re Lawrence,* 469 B.R. at 142. [4]

Once it is determined that the debtor has a residence, Section 522(d)(1) then requires that the debtor or a dependent of the debtor "uses [the property] as a residence."  11 U.S.C. § 522(d)(1) (2012).  The employment of the present tense verb "uses" has been construed as requiring a present use of the residence as of the bankruptcy petition date.  *In re Feliciano,* 487 B.R. at 51.  The petition filing date is the relevant time for analyzing the validity of the exemption.  *In re Cole,* 185 B.R. 95, 97 (Bankr. D. Me. 1995) (citing *In re Grindal*, 30 B.R. 651, 656 (Bankr. D. Me. 1983)).

---

[4] The Trustee urges the Court to determine that the property does not qualify as a "residence" under the federal exemption by applying the "homestead" exemption requirements under Arkansas law.  Indeed, Section 522(d)(1) has spawned two lines of cases, one interpreting the term "residence" according to its plain meaning and the other equating the term "residence" to that of a homestead under state law. *In re Stoner*, 487 B.R. 410 415-417 (Bankr. D.N.J. 2013) (citations omitted).  This Court adopts the line of cases finding the term "residence" unambiguous and applying the plain meaning of the statute.

Although "[g]enerally, a residence will refer to a home that a debtor owns and occupies at the time of the filing[,] . . . the determining factor should not be so mechanical as to require a debtor to occupy the home on the filing date or use the address on the bankruptcy filing." *In re DeMasi,* 227 B.R. 586, 588 (D.R.I. 1998). Indeed, in some circumstances consideration should be given to the reason the debtor is absent from the home and whether the debtor had an intention to return. For example, courts have recognized that an intention to return to property where the absence is temporary may meet the use requirements of Section 522(d)(1). *See, e.g., In re Anderson,* 240 B.R. 254, 259-60 (Bankr. W.D. Tex. 1999) (debtor allowed to exempt property she was forced to leave temporarily while serving in the armed services); *accord In re Murphy*, 292 B.R. 403 (Bankr. D.N.D. 2003) (debtor allowed state law exemption in property she vacated in order to pursue higher education degree in another state).

Similarly, courts have allowed a claim of exemption in a residence where the debtor is prohibited by some valid reason from presently occupying the property. *In re DeMasi,* 227 B.R. at 588 (allowing debtor to exempt property in which he held remainder interest although prohibited from living on property at time of bankruptcy filing due to physical presence of person holding life estate); *In re Voliva,* No. 10-10031-8-RDD, 2011 WL 6301232, at *3 (Bankr. E.D.N.C. Dec. 16, 2011) (allowing exemption where debtors were not occupying property due to hurricane damage and debtor's need for medical treatment).

Courts allowing exemptions where there is constructive rather than actual occupancy have done so even when the debtor is renting the property to a third party at the time the bankruptcy petition is filed. *See, e.g., In re Murphy*, 292 B.R. at 406 (debtor renting property to protect property while she lived out-of-state to pursue higher education degree); *In re Anderson,*

240 B.R. at 259-60 (debtor renting property to third party to defray expenses while debtor was serving in armed services).

However, qualification for a Section 522(d)(1) exemption requires "'some positive indication of an intent to occupy the premises; an undefined floating intention is inadequate.'" *In re Feliciano,* 487 B.R. at 52 (quoting *In re Lozada Rivera,* 470 B.R. 109, 117 (Bankr. D.P.R. 2012)); *see also In re Lusiak,* 247 B.R. 699, 703 (Bankr. N.D. Ohio 2000) (defining "constructive occupancy" as "physical absence from a premises coupled with an intent to return to the premises at some point in the future").

Accordingly, a stated intention to return to the property cannot be a hollow statement. The evidence must also show that returning to the property is within the realm of possibility under the facts of the case. *In re Feliciano,* 487 B.R. at 52 (citing *In re Lozada Rivera,* 470 B.R. at 117); *accord In re Bennett,* 192 B.R. 584, 587-88 n.16 (Bankr. D. Me. 1996) (sustaining objection to state law residence exemption). "A debtor must also demonstrate a meaningful ability to occupy the property imminently or within a reasonable time." *In re Bennett,* 192 B.R. at 587-88; *In re Lusiak,* 247 B.R. at 703 (finding the "debtor's own testimony must be coupled with external circumstances which would demonstrate that it would be realistic to expect that the debtor will actually return to the property").

In determining whether a debtor has the ability to return to the property, courts have considered the condition of the property. The court in *In re Holland* sustained the trustee's objection to the debtor's claimed exemption in property where the court found the property to be uninhabitable. *In re Holland,* 474 B.R. 826, 828-29 (Bankr. E.D. Mich. 2012) (holding property without plumbing or windows did not qualify for exemption).

In accordance with the foregoing case law and for the reasons that follow, the Court finds that the Trustee has met his burden of proving the Debtors are not entitled to claim the 17 Acre Tract as exempt under Section 522(d)(1).

First, the 17 Acre Tract was not the Debtors' residence at the time the bankruptcy petition was filed.  Mary Tankersley inherited the 17 Acre Tract from her mother in 1981, but has not lived on the property since leaving her childhood home in the early 1960s.

Further, although the Debtors did discuss moving to the 17 Acre Tract in 2008, they decided instead to move into the Walkers Corner Property where they lived at the time the bankruptcy petition was filed.  Significantly, Mary Tankersley testified that when they purchased the Walkers Corner Property in 2008 they expected to live there the rest of their lives.  She further testified they spent at least $100,000.00 to improve the Walkers Corner Property.  No evidence supports a finding that the Debtors were temporarily occupying the Walkers Corner Property with the intent to later reside on the 17 Acre Tract.

Once the Debtors realized they were going to lose the Walkers Corner Property and had to find a place to live, they began discussing the possibility of moving to the 17 Acre Tract.  In their discussions, they did not consider living in the house on the property but did contemplate using a travel trailer to serve as a residence on the 17 Acre Tract.  Although at least one case has allowed an exemption in property under somewhat similar facts, the debtor in that case was in the process of moving to the property on the petition date, had listed the property claimed as exempt as her residence on the petition, and had filed a motion to avoid lien on the property.  *In re Yanovich,* 544 B.R. 306, 313 (Bankr. W.D. Pa. 2016).

The Debtors in the case before the Court did not list the 17 Acre Tract as their residence on their petition and had not taken any steps to move to the property at the time of filing

bankruptcy. In fact, moving into the house on the property was not a possibility. According to Mary Tankersley, the house is not in suitable condition to be lived in by anyone, having been gutted by prior renters and requiring $50,000.00 to $75,000.00 in repairs. Mary Tankersley was adamant that she would not consider living in the house. Further, the Debtors were not physically or financially able to make necessary improvements to the property, such as installing a septic tank and water lines that would accommodate a travel trailer to serve as their residence.

Second, the Debtors' rental of the 17 Acre Tract does not qualify as using the property as a residence on the petition date. While courts have allowed the rental of property to serve as "constructive occupancy," they have done so only when the rental was coupled with a temporary absence and intent to return to the property. *See, e.g., In re Murphy*, 292 B.R. at 406; *In re Anderson,* 240 B.R. at 259-60.

In the instant case, the rental of the house on the 17 Acre Tract did not serve the purpose of either defraying costs or preserving the property during a temporary absence. In fact the circumstances here were a bit unusual in that a house Mary Tankersley described as not being suitable for anyone to live in was occupied by a "homeless guy" who begged her to let him stay there and who did not regularly pay the meager $200.00 monthly rent payment. The description of this unusual arrangement and the lack of any intention on the part of the Debtors to live in the property after a temporary absence do not convince the Court that the occupancy by the homeless person meets the requirements of "constructive occupancy."

The Debtors cite the cases of *In re Demeter* and *In re Lawrence* in support of their argument that the Debtors may own two residences and choose either for their claim of exemption. The facts of both cases are distinguishable from the facts before the Court.

25

In *Demeter,* the court allowed a debtor to claim an exemption for *either* of two properties used by the debtor on the date of filing bankruptcy. *In re Demeter*, 478 B.R. 281 (Bankr. E.D. Mich. 2012). The debtors were using one property as their main place of residence, and the second as their "vacation home," residing in each about half of the year with the intent to make the vacation property their permanent residence in the future. *Id.* at 284. In determining the debtors could claim *either* residence as exempt, the court's decision relied on Congress's intentional restraint from classifying the residence to be exempted as "primary" or "principal." *Id.* at 287-88.

In *Lawrence*, the court held that the debtors' "use" of a vacation home satisfied the requirement of present use in accordance with Section 522(d)(1). The court stated that whether the debtors were using one of their residences as a vacation home *or* were in the midst of relocating to the vacation property permanently on the date of the petition filing, "[e]ither way [the property] [is] being used." *In re Lawrence*, 469 B.R. at 143. The court in *Lawrence* found that, while it is possible to own more than one residence and the exemption is not limited to the "primary" or "principal" residence, the exemption is limited to only one residence.

Unlike the facts in the cases of *Demeter* and *Lawrence,* the facts before the Court do not support a finding that the Debtors had two residences. Mary Tankersley has not resided on the 17 Acre Tract since the early 1960s; Bob Tankersley has never resided there. The 17 Acre Tract was neither a vacation home nor second home to the Debtors.

Based on the foregoing discussion, the Court finds that the Trustee has met his burden of proving the Debtors are not entitled to claim an exemption in the 17 Acre Tract under Section 522(d)(1). The 17 Acre Tract was not used as a residence by either Debtor or any dependent of either Debtor on the petition date. Further, even if the Debtors were found to have intended to

26

use the property as a residence, the property is uninhabitable, and the Debtors are not physically or financially able to either repair the house or prepare the property to accommodate a travel trailer to use as a dwelling.  Finally, as the Court has previously stated, the circumstances surrounding the rental of the property do not support a finding of constructive use of the property during a temporary absence.  For these reasons, the Trustee's Objection as to the exemption of the 17 Acre Tract under Section 522(d)(1) is sustained.

### *Valuation of the Faulkner County Properties*

The third issue raised by the Trustee in his Objection is that the Debtors have undervalued the Faulkner County Properties in an attempt to fully exempt the properties, and the amounts of the claimed exemptions exceed the amounts allowed under the Bankruptcy Code.

The Debtors argue that their values are correct.  The Debtors introduced, *inter alia,* their Schedule A/B and the testimony of Mary Tankersley in support of their values.  The Trustee introduced the testimony of Mary Tankersley, the Debtors' Schedule A/B, the Property Tax Cards maintained by the Faulkner County Assessor's Office, and two personal financial statements for the Debtors, one dated December 31, 2011, and the other dated December 31, 2012.

The following chart reflects the values assigned to the properties in the Debtors' Schedule A/B, along with the Debtors' notations concerning the values.  The fourth column reflects the tax appraised values from the Property Tax Cards maintained by Faulkner County Assessor's Office introduced by the Trustee:

| Property Description | Schedule A/B Value | Comments | Tax Appraised Value |
|---|---|---|---|
| 17 Acre Tract | $25,400.00 | Value is Tax Appraisal. | $24,950.00 |
| Two Acre Tract | $ 1,000.00 | Value is Tax Appraised Value. | $    350.00 |
| 2.94 Acre Tract | $ 5,000.00 | Tax Appraisal value is $17,400. Value below is Debtors assessment. | $17,650.00 |
| Three Acre Tract | $ 1,900.00 | Value is Tax Appraisal. | $19,000.00 |
| 13 Acre Tract | $ 1,850.00 | Value is Tax Appraisal. | $ 1,600.00 |

Debtors' Ex. 1; Trustee's Ex. 1; Trustee's Ex. 4.

The Trustee questioned Mary Tankersley about the values of each tract of land. As to the 17 Acre Tract, Mary Tankersley testified that the value in the schedules was "pretty close" to the tax assessor's appraised value. (Tr. at 32). On cross examination when asked about the value she stated, "I really don't know for sure . . . I would just have to guess, but I don't know." (Tr. at 60).

As to the Two Acre Tract valued at $1,000.00 in the schedules, Mary Tankersley stated she guessed the value came from the tax assessor's appraisal. (Tr. at 34).

When asked how she determined the $1,900.00 value listed in the schedules for the Three Acre Tract, she answered, "I just – an estimate." (Tr. at 36). But when asked whether it was her intent to put the tax appraised value in her schedules for the Three Acre Tract, she answered, "Yes." However, the tax assessor's appraised value was $19,000.00. (Trustee's Ex. 4). On cross examination when asked, "Do you know what that value ultimately is?" she answered, "I do not really." (Tr. at 63).

When asked about the value of the 13 Acre Tract, Mary Tankersley testified, "I wouldn't even know how to estimate the value on that thing. I haven't been over there but once or twice

28

since I obtained it.  I – I don't even know."  (Tr. at 34).  On cross examination she admitted that her last visit to the property occurred shortly after she married Bob Tankersley in 1986.

The law is clear that an owner is competent to give her opinion of the value of her own property, as provided by Federal Rule of Evidence 701--Opinion Testimony by Lay Witnesses. Barry Russell, BANKRUPTCY EVIDENCE MANUAL, § 701.2 (2015-16 ed.) (citations omitted). Such testimony is admissible under the Federal Rules of Evidence but is limited by certain conditions, including that the testimony be "rationally based on the witness's perception . . . ." FED. R. EVID. 701.

Moreover, even if uncontradicted, an owner's testimony as to valuation "should be subject to the same type of critical analysis as would the testimony of an independent 'expert.'" *In re Brown*, 244 B.R. 603, 612 (Bankr. W.D. Va. 2000) (debtor's valuation of her property seemed "pulled out of the air" and, therefore, not credible or probative).  In the instant case, Mary Tankersley's testimony regarding the Faulkner County Properties, while admissible, consistently revealed a lack of personal knowledge and, in many instances, did not seem rationally based on her own perception.  For that reason, the Court does not find Mary Tankersley's testimony either credible or probative on the issue of value.

The two financial statements introduced into evidence by the Trustee indicate the combined value of the Faulkner County Properties is $190,000.00.  (Trustee's Ex. 5).  Mary Tankersley testified that Sharon Tankersley prepared the statements and arrived at that value. However, Mary Tankersley also stated that she did review the financial statements after they were prepared and signed them knowing they were being used to obtain bonds for Co-Bar construction projects.  The financial statements, signed by Mary Tankersley, directly contradict her testimony regarding the value of the Faulkner County Properties.

29

Mary Tankersley admitted that the values on the Property Tax Cards introduced by the Trustee were the values she was referring to in the notations on the schedules and in her testimony when referring to the assessor's tax appraisals.  (Tr. at 45-46).  She also admitted that she used the values on the Property Tax Cards to determine the values that she listed in her schedules.  (Tr. at 46).

Considering all the foregoing testimony and evidence, the Court finds that the Trustee has met his burden of proof as to the values of the Faulkner County Properties.  No credible testimony or other evidence refutes the appraised values reflected on the Property Tax Cards, and no argument was made that the appraised values on the Property Tax Cards are unreliable.  To the contrary, Mary Tankersley admitted that she herself relied on the appraised values on the Property Tax Cards in valuing every tract except the 2.94 Acre Tract.  Therefore, the Court finds the weight of the evidence supports a finding that the values of the Faulkner County Properties are the tax appraised values in the following amounts:  the 17 Acre Tract--$24,950.00; the Two Acre Tract--$350.00; the 2.94 Acre Tract--$17,650.00;  the Three Acre Tract--$19,000.00; and the 13 Acre Tract--$1,600.00.

### *Valuation of Bob Tankersley's Inchoate Curtesy Interest*

Having found that Bob Tankersley has an inchoate curtesy interest in the Faulkner County Properties, the Court concludes that he is entitled to exempt only the present value of that interest.  *In re Miller*, 151 B.R. 800, 802 (Bankr. N.D. Ohio 1992).  The next step is to determine what Bob Tankersley's inchoate curtesy interest in the Faulkner County Properties is worth.  The "determination of the value is more difficult when [curtesy] is inchoate than when it is consummate."  *Tatum v. Tatum*, 174 Ark. 110, 295 S.W. 720, 721 (1927).

In calculating the inchoate curtesy interest value, consideration must be given not only to the values of the various Faulkner County Properties as determined by the Court above, but also

to the inchoate nature of the interest, the limitation of the interest as a life estate in the ancestral property, and the ages and health of both Debtors. *Id.* (holding the determination of value "involves the consideration of the ages of two persons instead of one, and the consideration of the health, habits, and expectancy of life of both").

In the *Flippin* case, the parties stipulated that the value of the inchoate interest at issue could be determined based on the table contained in Section 18-2-105 of the Arkansas Code Annotated. *Clark v. Flippin*, No. 05-3066, 2006 WL 2850046, at *4 (W.D. Ark. Sept. 29, 2006). Based on this stipulation, the district court allowed the parties to refer to this table to value the interest in that case. *Id.*

The purpose of the table used in the *Flippin* case, however, is "to establish a simple and accurate method for computing the present value of both *vested* life and remainder interests in property through the use of actuarial tables and to make the actuarial tables used in connection therewith current." ARK. CODE ANN. § 18-2-101(a) (2015) (emphasis added). Thus, the statute makes it clear that the table applies only to vested interests.

In the instant case, the parties have not stipulated to the use of the table used in *Flippin* to calculate the value of Bob Tankersley's inchoate curtesy interest, and, accordingly, it will not be employed to determine the value of his interest. Research has revealed no other actuarial table or methodology in the Arkansas statutes that pertains to valuing inchoate future interests.

Without a table to quantify Bob Tankersley's interest, the Court will proceed by first considering what portion of the property is subject to that interest. As stated earlier, the statute, as to ancestral property, endows the surviving spouse with a life estate interest in one-half the dying spouse's real estate as to collateral heirs and in one-third the dying spouse's real estate as to creditors.

31

The Arkansas Supreme Court has discussed how to determine what portion of a decedent's estate is subject to dower or curtesy in several cases.  In *Mayo v. Arkansas Valley Trust Company*, the court stated that collateral heirs are only entitled to an inheritance if one-half of the estate is more than sufficient to pay the debts of the estate, "but in no event can their rights encroach upon the rights of the widow" to one-half of the estate as against collateral heirs.  132 Ark. 64, 200 S.W. 505, 506 (1917).  The one-half interest of the surviving spouse is subject to reduction only if the other one half of the estate is insufficient to pay the debts and expenses of administration in full.  *Whitener v. Whitener*, 227 Ark. 1038, 1043-44, 304 S.W.2d 260, 263 (1957).

Because Mary Tankersley is still living, the value of her assets and the amount of debt she will owe upon her death are unknown.  The absence of this information makes it impossible to precisely determine what proportion of her property would be subject to Bob Tankersley's curtesy interest if he outlives her, whether a one-third life estate interest as to creditors, a one-half share as to collateral heirs, or some portion between the two.

In a case where, as here, an *inchoate* future interest was at issue, the Arkansas Supreme Court decided that the spouse was entitled to a one-third interest in the proceeds from her husband's real property to protect her inchoate dower interest.  *B.H.&M. Oil Co. v. Graves*, 182 Ark. 659, 32 S.W.2d 630 (1930).  In the *Graves* case, the husband had conveyed oil, gas, and mineral rights in his property by warranty deed without the wife joining in the conveyance.  She argued that she was entitled to one-half the proceeds, but the court decided she was due no more than the one-third portion "against creditors."  *Graves*, 182 Ark. at 659, 32 S.W.2d at 631.

The *Graves* case supports the proposition that Bob Tankersley's inchoate life estate should be protected as a one-third interest in the Faulkner County Properties rather than a one-

half interest. *Graves,* 182 Ark. at 659, 32 S.W.2d at 631. This is consistent with the current purpose of the valuation, which is to determine the proper exemption to be allowed in order to protect Bob Tankersley's inchoate life estate interest as against creditors.

To value Bob Tankersley's interest the Court starts with the values as determined by the Court above for the Faulkner County Properties. Those values would be reduced by two-thirds to determine a one-third interest consistent with applicable statutes and the *Graves* case. Next, a reduction in value is necessary to determine the present value of Bob Tankersley's future interest. *Webber v. Webber,* 331 Ark. 395, 401, 962 S.W.2d 345, 348 (1998) ("a widow's right of dower, even in real property, remains only an inchoate right until the husband's death"). A further reduction is then necessary due to the Faulkner County Properties being ancestral property, endowing Bob Tankersley with a life estate rather than a fee simple interest. Finally, consideration must be given to Mary Tankersley's and Bob Tankersley's "health, habits, and expectancy of life" as directed by the court in the *Tatum* case.[5] *Tatum,* 174 Ark. at 110, 295 S.W. at 721.

The Court is without sufficient evidence to complete the determination of value; however, it is not necessary to do so. In the instant case, Bob Tankersley did not schedule *any* interest in the Faulkner County Properties in Schedule A/B, but did claim an exemption in the properties without limiting the value of his interest to the present value of his inchoate life estate interest. For the reasons stated above, without limiting his interest to the present value of his inchoate life estate interest, the exemption values are overstated.[6] *In re Miller,* 427 B.R. 616, 620 (Bankr. N.D. Ohio 2009) ("to the extent that property is limited in the hands of the debtor,

---

[5] In considering these additional factors in the instant case, it is conceivable that the value of Bob Tankersley's interest is *de minimis* given Bob Tankersley's health issues and the fact that the Debtors are the same age.

[6] The Debtors acknowledged in their brief that their interest "must be calculated pursuant to Arkansas law, and affirmatively state[d] that they will amend their claimed exemptions accordingly should the Court find in their favor[.]" (Debtors' Br. at 3, Nov. 14, 2016, Doc. #101).

[his] right to exempt the property is likewise limited").  Therefore, the Trustee has met his burden of proving that the exemptions claimed by Bob Tankersley in the Faulkner County Properties are overstated.

For the foregoing reasons, the Court finds that the Trustee's Objection as to the Debtors' valuation of the assets claimed as exempt is sustained both as to the Faulkner County Properties and as to Bob Tankersley's inchoate life estate interest in the Faulkner County Properties.

## CONCLUSION

The set of circumstances that has resulted in this bankruptcy filing by Bob and Mary Tankersley is very unfortunate.  The Court understands the hardships the Debtors face and the pleas for compassion made by their counsel.   However, the Court can only allow the Debtors' exemptions within the legal boundaries of the applicable statutes and case law.  While the Debtors are unable to claim exemptions on all the property they had hoped to retain, they should not lose sight of the benefits afforded them by the bankruptcy filing.  Chief among these is their ability to discharge approximately $2 million in debt.

Based on the foregoing findings of fact and conclusions of law, the Trustee's Objection to the Debtors' exemptions is sustained.  The Debtors shall have thirty days to file an amended Schedule C claiming exemptions consistent with this memorandum opinion.  A separate judgment will be entered reflecting the Court's ruling.

Phyllis M. Jones
United States Bankruptcy Judge
Dated:  08/28/2017

cc:     M. Randy Rice, Chapter 7 Trustee

        Kevin P. Keech, Attorney for Debtors

        United States Trustee